IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

COURT OF APPEALS DOCKET NO. 23-12754

---

**KEVIN LEWIS**

**Appellant,**

**v.**

**SHERIFF PATRICK LABAT, in his
official capacity as the Sheriff of
Fulton County, Georgia, *et al.*,**

**Appellees.**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
No. 1:22-CV-0532-JCF

---

**APPELLANT'S BRIEF**

Prepared by:

Jake Knanishu
Georgia Bar No. 597103
James Radford
Georgia Bar No. 108007
*Counsel for Appellant*

# U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT (CIP)

Lewis _vs._ Labat et al.    Appeal No. 23-12754

11th Cir. R. 26.1-1(a) (enclosed) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed. Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.** In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

*(please type or print legibly)*:

Bowman, Brad - Attorney for Defendant-respondent

Fuller, Clay - Magistrate Judge

Hart, R. Jonathan - Attorney for Defendant-respondent

Knanishu, Jake - Attorney for Plaintiff

Labat, Sheriff Patrick - Defendant-respondent

Lewis, Kevin - Plaintiff-petitioner

Radford, James - Attorney for Plaintiff

Wilcher, Sheriff John - Defendant-respondent

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Lewis respectfully requests oral argument on his appeal to allow this Court a full opportunity to investigate and address all the relevant issues. This appeal involves nuanced issues of constitutional law and sovereign immunity that Mr. Lewis believes would benefit from oral argument.

# TABLE OF CONTENTS

Table of Citations ................................................................................................v

Statement of Subject-Matter and Appellate Jurisdiction ....................................... vii

Statement of the Issues.............................................................................................1

Statement of the Case...........................................................................................1

Summary of the Argument.......................................................................................13

Argument and Citations of Authority ....................................................................15

Conclusion ............................................................................................................32

Certificate of Compliance ......................................................................................34

Certificate of Service .............................................................................................34

# TABLE OF CITATIONS

**Statutes**

28 U.S.C. § 1331 ................................................................................. vii

28 U.S.C. § 1291 ................................................................................ viii

42 U.S.C. § 12131 .............................................................................. vii

29 U.S.C. § 701 ....................................................................................2

42 U.S.C. § 1983 ..................................................................................2

42 U.S.C. § 12132 ..............................................................................16

42 U.S.C. § 12101 ..............................................................................21

**Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ...................................16

*Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072 (11th Cir. 2007) ........................ 15, 21

*Black v. Wigington*, 811 F.3d 1259 (11th Cir. 2016)....................................... 15, 26

*Campbell v. Sikes*, 169 F.3d 1353 (11th Cir. 1999)....................................28

*Cash v. Smith*, 231 F.3d 1301 (11th Cir. 2000) ................................... 16, 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................16

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .......................................26

*Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379 (11th Cir. 2005).....................15

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022).....................25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ....................................................................................................................30

*Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582 (1983)… ....................................................................................................................25

*Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334 (11th Cir. 2012) ................25

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)..........................................30

*Rosen v. Montgomery Cty., Md.*, 121 F.3d 154 (4th Cir. 1997) .............................23

*Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008).....................26

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007)....... 15, 30

*Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001).....................................................16

*Sierra Club v. Martin*, 110 F.3d 1551 (11th Cir. 1997)..........................................30

*Silberman v. Miami Dade Transit*, 927 F.3d 1123 (11th Cir. 2019) ............... 26, 29

*Tennessee v. Lane*, 541 U.S. 509 (2004) ......................................................... 21, 27

*United States v. Georgia*, 546 U.S. 151, 159 (2006) ........................................ 26, 27

*Washington v. Davis*, 426 U.S. 229 (1976) ...........................................................26

**Regulations**

29 C.F.R. § 1630.2(o)(3)...........................................................................................21

**Other**

Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure................................ vii

## STATEMENT OF
## SUBJECT-MATTER AND APPELLATE JURISDICTION

Mr. Lewis' claims arise out of federal law, and the district court below had original federal-question jurisdiction pursuant to 28 U.S.C. § 1331.

This is an appeal from a final dispositive order of the district court dismissing Mr. Lewis' claims on summary judgment. This Court therefore possesses appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Mr. Lewis filed his Notice of Appeal on August 15, 2023, [Doc. 91], within thirty days of the district court's dispositive order of July 18, 2023. [Doc. 89]. This appeal is therefore timely pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES

The issues Mr. Lewis raises in this appeal are:

1.    Whether the district court erred in ruling as a matter of law that the Fulton and Chatham County Sheriffs' Offices did not discriminate against Mr. Lewis because of his disability;

2.    Whether the district court erred in treating Mr. Lewis' claims under the Rehabilitation Act as dispositive of his claims under the Americans with Disabilities Act; and

3.    Whether the district court erred in ruling that Mr. Lewis's claims for prospective relief are moot.

## STATEMENT OF THE CASE

### I.    The Course of Proceedings and Disposition in the Court Below

Plaintiff/Appellant Kevin Lewis ("Mr. Lewis") was arrested on August 1, 2020, and taken to the Chatham County jail. [Doc. 77 at ¶ 2]. On August 3, 2020, he was transferred to the Fulton County jail. *Id.* at ¶ 3. On August 19, 2020, he was released into house arrest. [Doc. 19 at ¶ 75]. On December 30, 2020, the Superior Court of Fulton County dismissed the charges against Mr. Lewis with an Order of *Nolle Prosequi*. [Doc. 84-9].

On February 8, 2022, Mr. Lewis filed his initial complaint in this case, [Doc. 1], which he amended March 18, 2022, [Doc. 19], bringing claims under Title II of

1

the Americans with Disabilities Act, as amended (the "ADA"), 42 U.S.C. § 12131 *et seq.*; under the Rehabilitation Act of 1973, as amended ("Rehab Act"), 29 U.S.C. § 701 *et seq.*; and under 42 U.S.C. § 1983 ("Section 1983"). Defendants/Appellees all answered the Amended Complaint. [Doc. 22; Doc. 24].

On February 21, 2023, following the conclusion of the discovery period, Defendants/Appellees Fulton County and Patrick Labat ("Sheriff Labat") jointly filed a motion for summary judgment on all claims. [Doc. 76]. Defendant/Appellee John Wilcher ("Sheriff Wilcher") filed one as well. [Doc. 71]. Defendant/Appellee Chatham County did not file a motion for summary judgment but purported to join Sheriff Wilcher's reply brief. [Doc. 87; Doc. 87-1].

The parties agreed to trial by a magistrate judge, and on July 18, 2023, the magistrate entered an order granting both motions and dismissing all of Mr. Lewis' claims against all Defendants. [Doc. 89]. Mr. Lewis filed his notice of appeal August 15, 2023. [Doc. 91].

## II.    Statement of the Facts

Viewed in the light most favorable to Mr. Lewis, the relevant facts are as follows:

Since 2016, Mr. Lewis has suffered from keratectasia, a degenerative and painful kind of blindness. [Doc. 84-2 at ¶ 1]. Because of his keratectasia, without medication, Mr. Lewis' eyeballs are, *inter alia*, prone to ulceration and

extraordinarily susceptible to infection. *Id.* at ¶ 2. In 2018, Mr. Lewis was declared legally blind, and in 2019, he reached total corneal blindness. *Id.* at ¶ 3.

*Detention at Chatham County*

Upon arrival at the Chatham County jail on August 1, 2020, Mr. Lewis and the officer who transported him there both alerted the jail's staff to his disability and limitations. [Doc. 85-2 at ¶¶ 9, 10]. He needed assistance with multiple aspects of the jail's intake process, and he asked for such assistance "numerous" times. *Id.* at ¶ 10. He "wasn't provided any guidance as to [his] surroundings or what was or was not taking place." *Id.* at ¶ 11. When he asked one officer approximately how many steps he needed to take to the next station in the intake process, the officer told him, "If I knew that, I'd be playing the lottery." *Id.* at ¶ 17. Other officers simply "ridiculed [him] for not being able to know where [he] was going." *Id.* at ¶ 16. They presented him with at least three documents, which he could not read due to his blindness, and whose contents the officers refused to read to him. *Id.* at ¶¶ 12, 13. When he refused to sign two of them because he did not know their contents, one officer told him, "Look, you gotta sign it, and I'm not trying to hold you up here, but if you want to go, either you sign or, you know, you sit here." *Id.* at ¶ 15.

Mr. Lewis was also "very clear as to the medicine that [he] needed, the basic accommodations that were needed, the reasons for needing them, [and] the consequences for denying them." *Id.* at ¶ 19. A family friend of his, a doctor,

personally called Sheriff Wilcher and attempted to provide the Sheriff information regarding Mr. Lewis' need for accommodations. *Id.* at ¶ 20.

However, the only action the Chatham County jail took in recognition of Mr. Lewis' disability was to assign him to the medical unit. Sheriff Wilcher admits none of Mr. Lewis' numerous, specific requests for assistance with the phones, with reading documents he was ordered to sign, with navigating the jail, and with filing grievances were ever documented. Mr. Lewis himself could not document them, because his blindness meant he could not access the jail's grievance and/or accommodation request process.[1] No one at the Chatham County jail assisted Mr. Lewis in filing a grievance or formal request for accommodation, nor informed him how he could do so himself. *Id.* at ¶ 24.

Sheriff Wilcher presents no evidence and has never alleged that accommodating Mr. Lewis' blindness would have posed an undue hardship to the jail's operations.

*The Chatham County Jail's Official Policies and Actual Practices*

No official policy at the Chatham County jail directly addresses vision-related disabilities. [Doc. 85-2 at ¶ 27].

Only one policy provides any guidance on how an inmate should request a

---

[1] In fact, the Chatham County's Sheriff's Office cynically argued below that Mr. Lewis had failed to exhaust his administrative remedies by not completing a grievance form. [Doc. 71-1 at 22-23].

disability accommodation, and it requires inmates to do so in writing. [Doc. 85-12].

The jail also provides some information in an "inmate handbook," but as Sheriff

Wilcher's designated representative explained, "inmates who can't read" have no

way of knowing what is in the handbook except to get assistance from a social-

services provider. [Doc. 73-1 at 73:18-74:7].

Similarly, only one official policy at Chatham County—the "Receiving and

Discharge" policy—expressly discusses how accommodation requests should be

addressed, and in relevant part it provides only: "If the inmate is disabled and

requests/requires assistance, the officer will ensure that sufficient and adequate

assistance is rendered to the inmate to complete the dress-out procedure." [Doc. 85-

2 at ¶ 32] (emphasis deleted). Otherwise, official policy at the Chatham County jail

provides *no guidance whatsoever* for identifying an accommodation request, hearing

it, reaching a decision, communicating that decision to interested parties, or ensuring

the accommodation is respected. When pressed on these issues at deposition, Sheriff

Wilcher's designated representative was at a loss for words. [Doc. 73-1 at 40:11-

42:10; *id.* at 47:10-49:9; *id.* at 83:8-87:19 ("I don't know."); 114:12-115:25 ("I can't

say . . . . It depends.")].

With no formal processes in place, Sheriff Wilcher's representative explained

the informal "process" for receiving and responding to accommodation requests as

follows:

(1) The medical contractor is responsible for determining whether an inmate is disabled for the purposes of the ADA, *id.* at 41:9-42:5;

(2) When the medical contractor determines an inmate is disabled, that determination is actively withheld from the jail staff, ostensibly for medical privacy concerns, *id.* at 92:17-93:11, 110:2-10; 111:22-112:19;

(3) Upon receipt of an inmate's request of any kind, jail staff are simply supposed to document the request in "the log for the wing or the area at that time," *id.* at 68:15-69:14;

(4) If the request involves access to legal process, such as help using the phone to call an attorney, the jail's social-services contractor is supposed to handle it, *id.* at 86:19-87:9; however, the Sheriff presents no evidence its social-services contractor is aware of this delegation or that any mechanism exists for reliably communicating such requests to its social-services contractor;

(5) If the request is "medical" in nature, the medical contractor is supposed to handle it, *id.* at 41:9-42:24; however, again, the Sheriff presents no evidence its medical contractor is aware of this delegation or that any mechanism exists for reliably communicating such requests to its medical contractor;

(6) The Sheriff will then personally approve or deny the request as the final

decision-maker, *id.* at 46:17-19, but whatever the Sheriff's decision, jail staff are not informed, again supposedly because of medical privacy concerns. *Id.* at 77:14-78:5.

*Detention at Fulton County*

Upon his arrival at the Fulton County jail on August 3, like at Chatham County, staff simply did not take any account of Mr. Lewis' blindness. They placed him in general population for the first day he was there. [Doc. 78-1 at 55:8-19]. And even after his transfer to the medical unit on August 4, [Doc. 77 at ¶ 4], the doctor ignored Mr. Lewis' attempts to explain his keratectasia and asked Mr. Lewis to sign various paperwork as if he wasn't blind. [Doc. 84-2 at ¶ 5]. On August 5, the doctor returned and apologized for not believing Mr. Lewis, *id.* at ¶ 6, but he did not assist Mr. Lewis in any way with getting disability accommodations. [Doc. 78-1 at 62:9-12].

The inmate handbook at Fulton County provides some guidance on how to request accommodations, but it is only offered as a physical booklet—that is, not accessible to blind inmates. [Doc. 84-2 at ¶ 58]. The Securus kiosk system, which is how inmates use the telephone, [Doc. 79-1 at 21:14-22], is also inaccessible to people with vision-related disabilities. [Doc. 79-1 at 19:12-24; Doc. 78-1 at 94:24-95:16]. But Mr. Lewis did not even receive a copy of this paper handbook, or any help registering an account on the kiosk system, until mere hours before his release,

[Doc. 84-2 at ¶ 27], and no one ever gave him any information on how to request accommodations or file formal grievances, much less any assistance doing so. [Doc. 84-2 at ¶ 29].

Even though he was functionally shut out of the jail's regular grievance process, throughout his incarceration Mr. Lewis tried everything else he could do to get some attention to his needs for accommodations. He "expressed [himself] to whomever [he] thought to be in some administrative and/or authoritative capacity . . . . Anyone that seemed to be official that would be able to help [him], [he] tried to get help [from]." [Doc. 84-2 at ¶ 19]. He did so "any chance [he] got," *Id.* at ¶ 20, asking other inmates, the guards, and the nurses and doctors. *Id.* at ¶¶ 22-24. He was especially persistent requesting assistance with the jail's "kiosk" system, *id.* at ¶ 18, as well as "assist[ance] with step counts," "describing [his] surroundings," "helping [him] read," "helping [him] write," and especially "helping [him] get a phone call." *Id.* at ¶ 12. He asked for "[his] medication,[2] sanitary conditions . . . , a way for [him] to clean [his] eyes, a shower . . . , fresh clothes, toilet paper." *Id.* at ¶ 13. He asked for "[sanitizing] wipes, ideally, access to a shower each day, soap, a new washcloth, new clothes, a cell that wasn't covered in vomit and feces, [and] if nothing else, some cleaning supplies" such as a mop and some ammonia. *Id.* at ¶ 16.

---

[2] The medication he sought—two kinds of eyedrops, Advil, and a riboflavin vitamin—is all available over the counter. *Id.* at ¶ 14, 15.

At the Fulton County jail, though, as compared to Chatham County, Mr. Lewis' need for accommodations was even more urgent because he was there for over two weeks, in abhorrent conditions. When he moved into the medical unit on August 5, his cell reeked of feces, *id.* at ¶ 30, and on or around August 6, at the height of the COVID pandemic, he got a cellmate who was "very sick. Shortly thereafter [Mr. Lewis] became very sick, both of [them] are running a high fever, [and] there's feces all over the floor," *id.* at ¶ 34—in part because he didn't get a bar of soap or even one roll of toilet tissue for *ten days*. *Id.* at ¶ 38. In these putrid conditions, because of his keratectasia, Mr. Lewis' eyes became infected, causing him so much pain and vertigo that he couldn't keep food down. *Id.* at ¶ 36. Over the course of his incarceration, Mr. Lewis lost about twenty-five pounds. *Id.* at ¶ 41.

Like Sheriff Wilcher, Sheriff Labat admits, in his motion for summary judgment, that he has no evidence Mr. Lewis' requests were ever documented. [Doc. 77 at ¶ 8].[3] In short, like at the Chatham County jail, Mr. Lewis' transfer to the medical unit while at Fulton County is the only record evidence his disability was not entirely ignored while in custody.

Sheriff Labat presents no evidence and has never alleged any of Mr. Lewis' requested accommodations posed an undue hardship.

---

[3] Mr. Lewis' medical records and "Housing Transfer" forms are the only documents Sheriff Labat has which acknowledge Mr. Lewis' disability, and they do not contain any record of his accommodation requests. [Doc. 84-2 at ¶¶ 10, 11].

*The Fulton County Jail's Official Policies and Actual Practices*

Two policies at the Fulton County jail address the jail's ADA obligations in staff and visitation areas. [Doc. 84-2 at ¶¶ 43, 44]. One other, like at Chatham County, simply declares that the jail's programs and services "are accessible to impaired inmates in the same manner as non-impaired inmates" and requires inmates to submit accommodation requests in writing. *Id.* at ¶ 45.

The jail's ADA Classification policy is the only official policy statement governing accommodation requests by inmates, and it provides, first, that "[i]nmates who need accommodations must request them through the Jail Bureau Counselor." [Doc. 84-16 at 2]. However, according to the same policy, "[i]nmates needing an accommodation to participate in [a jail] program[]" must instead "notify the Program Coordinator." *Id.* at 5. Meanwhile, three other channels are dedicated to requests involving sanitation issues, environmental maintenance, or medical care. [Doc. 84-2 at ¶ 67].

But how is an inmate supposed to get their request in front of the Jail Bureau Counselor, Program Coordinator, sanitation, environmental, or medical staff? None of these policies identifies where or how an inmate should submit their accommodation request. The inmate handbook offers similarly little guidance, *id.* at ¶ 57, and it is only available in visual formats. *Id.* at ¶ 58. The ADA policy expressly obligates "staff," generally, to assist disabled inmates with filing grievances, [Doc.

84-16 at 7], but it does *not* state that all (or any) accommodation requests themselves should be treated as grievances. [Doc. 84-2 at ¶ 56].

Moreover, Sheriff Labat's designated representative testified the Fulton County jail does not provide its employees any specific training to ensure they uphold or even understand their responsibilities under the ADA or the official policies above. *Id.* at ¶ 59. Like at Chatham County, an inmate's disability and approved accommodations are also not documented anywhere outside his medical file. [Doc. 82-1 at 12:4-22]. As such, jail staff have no way of knowing which inmates need accommodations, which need help requesting accommodations, or when an inmate has been approved for an accommodation such as reading services.

Under oath, the Sheriff's Accreditation Manager agreed, in principle, that this information "should" be documented, *id.*, and that there "should" be a mechanism for ensuring jail staff provide accommodations and assistance requesting accommodations to inmates with disabilities, [Doc. 81-1 at 29:5-25], but no such mechanism exists. *Id.* For these reasons, she also agreed that the Fulton County jail's ADA policy "needs to be updated." *Id.* at 33:22-34:22.

For its part, the policy states it is reviewed "at least annually," [Doc. 84-16 at 7], but it has an effective date of January 1, 2002, *id.* at 1—more than twenty years ago today, and six years before the passage of the ADA Amendments Act of 2008. Indeed, some of the language in the policy is so antiquated the jail's Accreditation

Manager testified she was "shocked" to think it really has been reviewed annually since 2002. [Doc. 81-1 at 35:3-6]. If it has been, the Program Coordinator—that is, the individual officially responsible for effecting much of the policy, [Doc. 84-16 at 2; *id.* at 3; *id.* at 4; *id.* at 5; *id.* at 6]—is not involved in that review. [Doc. 82-1 at 12:23-14:3]. The Program Coordinator, testifying on the Sheriff's behalf, made her opinion clear like the Accreditation Manager: the Sheriff's Office's failure to update the jail's ADA policy for so long, when it is so grossly outdated, can only be the result of deliberate choice. [Doc. 81-1 at 35:21-36:6].

Because of these significant failures at the policymaking level, the Fulton County Jail handles disability accommodation requests, in practice, only as follows:

(1) If an inmate has a medical condition, that condition is documented in the inmate's medical file where only medical staff can access it; no effort is made to identify the inmate to non-medical staff as an individual with a disability whose requests for assistance are afforded special protections under federal law and official jail policy, [Doc. 82-1 at 12:19-22];

(2) If an inmate with a disability requests help of some kind, jail staff have discretion simply to ignore the request if they are skeptical of the inmate's need for help writing it down, [Doc. 80-1 at 27:20-28:9];

(3) If the jail staff member is not skeptical, but still "busy," they only "make sure the inmate is okay, and move on," *id.* at 27:3-6;

(4) If they choose to document the inmate's request, they only record the request in the unit's logbook for the day, [Doc. 81-1 at 30:15-23], just like at Chatham County, *see supra*;

(5) Requests that do find their way into the proper channels are handled by the Sheriff, through his chain of command, through the usual grievance and appeal process, [Doc. 80-1 at 28:10-18]—unless the request "relate[s] to medical care," [Doc. 82-1 at 21:22-22:4], in which case "the medical autonomy should trump whatever custody thinks," *id.* at 20:10-20;

(6) At that point, the accommodation is either granted or denied, provided or not, with no record made of the resolution except perhaps a note in the inmate's medical file. *Id.* at 12:4-22.

## SUMMARY OF THE ARGUMENT

The district court committed three reversible errors below.

First, the district court erred in granting both motions for summary judgment on the merits of Mr. Lewis' Rehab Act and ADA claims. In the district court's assessment, Mr. Lewis has not shown that he was excluded from participation in or denied the benefits of the jails' services. However, in reaching this conclusion, the district court ignored a significant amount of undisputed record evidence which establishes in multiple ways that Mr. Lewis, because he is blind, was deprived of equal access to many services and amenities the jails offer inmates without

disabilities—in particular, the jail's grievance processes, telephone services, and inmate handbooks. Each one of these denials presents at minimum a genuine dispute of fact as to whether Mr. Lewis suffered disability discrimination while in Chatham and Fulton Counties' custody.

Second, the district court erred in declining to address Mr. Lewis' constitutional arguments and treating his Rehab Act claims for damages as dispositive of his ADA claims. The district court dismissed Mr. Lewis' Rehab Act claims in part because the district court found Mr. Lewis has not shown deliberate indifference by the Sheriffs, which is necessary in a damages claim under the Rehab Act. However, Mr. Lewis' claims under the ADA here are distinct from his Rehab Act claims precisely because his ADA claims do not necessitate a showing of deliberate indifference. The discrimination Mr. Lewis suffered while incarcerated includes multiple violations of his Fourteenth Amendment rights, and so the Sheriff's Offices here enjoy no immunity to his ADA claims for damages, even without a showing of deliberate indifference.

Third, the district court erred in dismissing Mr. Lewis' claims for prospective relief under the mootness doctrine. The district court found that Mr. Lewis' release from custody mooted his claims for prospective relief, but because Mr. Lewis' claims arise out of his relatively brief pretrial detention—among other reasons—his prospective claims are protected under the "capable of repetition, but evading

review" exception to the mootness doctrine.

## ARGUMENT AND CITATIONS OF AUTHORITY

The standard of review for all three issues Mr. Lewis raises on appeal here is

*de novo*. *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007) ("This

Court reviews *de novo* the district court's grant of summary judgment, drawing all

facts and inferences in the light most favorable to [the non-movant]." (citation

omitted)); *Black v. Wigington*, 811 F.3d 1259, 1265 (11th Cir. 2016) ("We review

*de novo* whether the officers are entitled to immunity." (citation omitted)); *Sheely v.

MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007) ("Whether a

case is moot is a question of law that we review de novo." (citation omitted)).

**I.**     **The district court erred in determining, as a matter of law, that Sheriffs
Labat and Wilcher did not discriminate against Mr. Lewis because of his
disability.**

As the parties seeking summary judgment, the Sheriffs[4] bear the initial burden

here and must show that the record evidence allows for "no genuine dispute as to

any material fact." Fed. R. Civ. P. 56. This means that on issues for which Mr. Lewis

bears the burden of proof at a trial, "viewing all facts and reasonable inferences in

the light most favorable to [Mr. Lewis]," *Cruz v. Publix Super Markets, Inc.*, 428

F.3d 1379, 1382 (11th Cir. 2005) (citation omitted), the Sheriffs and Fulton County

---

[4] Mr. Lewis does not appeal the district court's grant of summary judgment to
Chatham and Fulton Counties, only to Sheriffs Labat and Wilcher in their official
capacities.

must convince the Court that the record presents "an absence of evidence to support [Mr. Lewis'] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Conversely, to defeat their motions, Mr. Lewis need only "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

"[T]he substantive law will identify which facts are material," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and the relevant substantive law in this case is straightforward. Substantively, claims under the ADA and Rehab Act "are governed by the same standards," *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000), and to state a *prima facie* case of discrimination under these laws, a plaintiff must show: "(1) that he is a 'qualified individual with a disability;' (2) that he was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'" *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132).

Element (1) above, Mr. Lewis' status as a "qualified individual with a disability" for the purposes of the ADA and Rehab Act, is not in dispute.

## A. Mr. Lewis was excluded from participation in, and denied the benefits of, several services, programs, and activities at both jails.

As to element (2), Mr. Lewis has identified numerous, specific "services, programs, or activities" at the two jails to which he was denied equal access. Perhaps

the most egregious of these denials regards the jails' grievance processes—despite Mr. Lewis' numerous pleas for various kinds of help, [Doc. 84-2 at ¶¶ 12, 13, 16, 18, 19, 22-24; Doc. 85-2 at ¶¶ 10-13, 19, 20], no one at either jail ever assisted Mr. Lewis with filing a grievance, nor even explained to him that's what he needed to do to request disability accommodations. [Doc. 84-2 at ¶ 29; Doc. 85-2 at ¶ 24]. As such, he was deprived of the ability even to request, much less receive, approval for reading services and assistance navigating the jails, assistance with the shower, or cleaning supplies for his cell such as a mop and ammonia. [Doc. 84-2 at ¶¶ 12, 13, 16, 18, 19, 22-24; Doc. 85-2 at ¶¶ 10-13, 19, 20].

The inmate handbooks at both jails offer some guidance regarding how to request such help, but Mr. Lewis was also denied equal benefit of these handbooks, because they are not offered in any format accessible to blind inmates. [Doc. 73-1 at 73:18-74:7; Doc. 84-2 at ¶¶ 57, 58].

Both jails also maintain computerized "kiosks" inmates can use as a resource for information about jail policies and processes, [Doc. 73-1 at 73:18-21; Doc. 84-2 at ¶ 27], but these kiosks utilize a touch-screen interface inaccessible to blind inmates, [Doc. 79-1 at 19:12-25; Doc. 80-1 at 16:15-20], and no one ever assisted him with the kiosks either. [Doc. 84-2 at ¶ 27].

Furthermore, because Mr. Lewis was unable to access the kiosks, he was also unable to access a telephone throughout his entire incarceration at Fulton County,

until just a few hours before his release. [Doc. 79-1 at 21:14-22; Doc. 84-2 at ¶ 27].

Mr. Lewis' testimony supports his claim that he was denied equal access to the services and amenities above, and the Sheriffs present no testimony or other evidence to dispute his account. To the contrary, the Sheriffs admit that Mr. Lewis needed help filing grievances, [Doc. 84-2 at ¶ 60], that no grievances were ever filed, [Doc. 71-1 at 22-23; Doc. 77 at ¶ 8], and that no one without access to Mr. Lewis' medical file had any way of knowing of his medical condition. [Doc. 73-1 at 92:17-93:11, 110:2-10; Doc. 82-1 at 12:19-22].

Rather than disputing the reality of Mr. Lewis's experience, the Sheriffs, in support of their motions for summary judgment, rely all but entirely on the jails' official statements of policy. [Doc. 76-1 at 2-4; Doc. 71-1 at 2-6]. But these official policy statements, such as they are, offer little guidance beyond vague, conclusory promises of equality. At Chatham County, official policy never addresses vision-related disabilities, [Doc. 85-2 at ¶ 27], and the one and only instruction it provides regarding accommodation requests by inmates is that they must be made in writing. [Doc. 85-12]. Fulton County offers somewhat more guidance, directing inmates, depending on the nature of their accommodation request, to the Jail Bureau Counselor, the Program Coordinator, or the sanitation, environmental, or medical staff, [Doc. 84-16 at 2; *id.* at 5; Doc. 84-2 at ¶67], but it never explains how these requests must be made or how an inmate should know to whom to direct their

request. Assuming accommodation requests should be filed as grievances, Fulton County also nominally obligates its staff to assist disabled inmates as necessary with filing grievances, [Doc. 84-16 at 7], but the Fulton County Sherriff's Office admits it does not train its employees on their responsibilities to disabled inmates under jail policy. [Doc. 84-2 at ¶ 59].

In short, regarding element (2) of Mr. Lewis' *prima facie* case, he identifies several specific ways—some of them indisputable—in which he was denied equal participation in and access to the jails' services, and in rebuttal, the Sheriffs only recite conclusory policy statements. They present at best scant evidence any effort was made—or even could have been made—to respond to Mr. Lewis' requests or to allow him to create a record of his requests. They have not come close to proving their compliance with the ADA as a matter of law and are therefore not entitled to summary judgment on this second element of Mr. Lewis' claims.

## B. Mr. Lewis' inequal access to the above services and programs offered at the jails was because of his disability.

Because he is blind, Mr. Lewis had simply *no* access to the inmate handbook or the kiosk system at either jail, and without the kiosk, he also could not access a phone for the full sixteen days of his incarceration at Fulton County. [Doc. 79-1 at 21:14-22; Doc. 84-2 at ¶ 27]. Mr. Lewis respectfully submits that these facts alone, all of which are undisputed, suffice to preclude summary judgment for the Sheriffs

on this third element of his claims.

However, Mr. Lewis' exclusion from the grievance system deserves special attention, because it illustrates the jails' mutual, fundamental dysfunction: In practice, inmates like Mr. Lewis, with disabilities that impair their reading or writing, only even get to *request* accommodations if their disability is obvious to the jail employee they ask for help. This is because, at both jails, employees are responsible for ensuring these inmates' requests are communicated to the proper decision-makers, [Doc. 73-1 at 68:15-69:14; Doc. 84-16 at 7], but these employees mostly have no way to verify an inmate's disability because that information is kept hidden from everyone but the medical contractors at both jails. [Doc. 73-1 at 92:15-93:11, 110:2-10, 111:22-112:19; Doc. 82-1 at 12:19-22]. Compounding the issue, these employees also have no obligation to believe the inmates, and at Fulton County, these employees don't even have to enter an inmate's request into the unit's logbook—much less render assistance filing a formal grievance—if the employee is "busy" or skeptical the inmate truly needs help. [Doc. 80-1 at 27:3-6; *id.* at 27:20-28:9].

Preventing this very kind of problem was one of the express purposes of the ADA's enactment: to protect people like Mr. Lewis, with "non-obvious" disabilities, from the pernicious, perhaps even innocent, discrimination of people we cannot expect to recognize or even know about conditions like keratectasia. *See, e.g.*,

*Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (discussing the pre-amendment 42 U.S.C. § 12101). That is why Title I of the ADA requires employers, among other things, to engage in an "interactive process" to "identify the precise limitations" of an employee's disability, 29 C.F.R. § 1630.2(o)(3), and it is why some jails, smartly, maintain a policy of letting their correctional officers know which inmates have disabilities that require special attention. *See, e.g.*, *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1088 (11th Cir. 2007) (affirming summary judgment for defendant county jail where corrections officers "affixed an ADA stamp to [the plaintiff's] jail card"). In Mr. Lewis' case, though, because you can't tell if someone's blind just by looking at them, jail staff were skeptical of his disability, [Doc. 84-2 at ¶¶ 4-6; Doc. 85-2 at ¶¶ 15-17], and had no way to know if he was telling the truth, thanks to the jail's utterly dysfunctional policies. As a result, for over two weeks, Mr. Lewis asked over and over again for access to a phone or a shower or even just a mop, and no one ever wrote these requests down, much less communicated them to someone with the authority to grant or deny them.

Indeed, Sheriff Wilcher's admission that he doesn't employ a policy like the jail in *Bircoll* because of "HIPAA" shows that the failure to accommodate disabled inmates at the Chatham County jail is the result of the Sheriff's own deliberate policy choice to conceal inmates' disabilities from the jail staff. As such, at a minimum, the record presents a genuine dispute of fact as to whether Mr. Lewis' injuries at

Chatham County were the result of Sheriff Wilcher's deliberate indifference.

Similarly, at the Fulton County jail, the official ADA policy states it "shall be reviewed at least annually," but it hasn't been updated since 2002, [Doc. 84-16 at 1]—that is, since before *Tennessee v. Lane*, before *United States v. Georgia*, before the ADA Amendments Act, *Bircoll*, and other major developments in disability-rights law and policy. This fact is indisputable, and the Sheriff offers no excuse at all for these twenty years of neglect. Instead, the Sheriff has only admitted, through his designated representatives, that the policy "needs to be updated," that his failure to update it for so long is "shock[ing]," and that such a long delay at the very least suggests this neglect is willful. [Doc. 81-1 at 35:21-36:6; Doc. 91-1 at 33:22-34:22, 35:3-6]. On this evidence, a reasonable jury could easily conclude that Mr. Lewis' injuries at Fulton County too were the result of deliberate indifference by the Sheriff's Office.

In sum, Mr. Lewis' status as an individual with an ADA-protected disability is undisputed, and the great bulk of the record—much of which is also either undisputed or admitted—supports Mr. Lewis' claims that, because of his disability, the Chatham and Fulton County jails discriminated against him in their provision of numerous, specific services afforded to inmates generally, including essential legal services such as access to the jails' grievance processes. Furthermore, the record establishes that this discrimination is not excused by some undue burden

accommodating him may have caused, but is only the result of the Sheriffs'
indifference at a policymaking level to the jails' ADA obligations.

## C. The district court's errors.

The district court's order dismissing all of Mr. Lewis' claims does not discuss
much of the above evidence. Instead, the district court summarized Mr. Lewis' "core
contentions" as only the claim:

> that Defendants denied him reasonable accommodations (1) during the
> booking process at both institutions, (2) by failing to provide him with
> his requested medicated eye-drops at both institutions, and (3) by
> subjecting him to unsanitary conditions at the Fulton County jail.

[Doc. 89 at 17]. The district court then dismissed item (1) above by comparing this
case to *Rosen v. Montgomery Cty., Md.*, 121 F.3d 154 (4th Cir. 1997), dismissed
item (2) by noting that Mr. Lewis did receive some eyedrops, and dismissed item (3)
by observing that the Fulton County jail was unsanitary for everyone, not just Mr.
Lewis. [Doc. 89 at 17-19].

Such a short and narrow discussion, however, reflects a clear misapplication
of the summary-judgment evidentiary standard—indeed, it only seems to discuss the
items of evidence which, standing alone, other courts have ruled inadequate as a
matter of law, such as in *Rosen*.

More to the point, the district court's order simply ignores altogether Mr.
Lewis' most powerful evidence. For example, the order's summary of the facts
devotes only two sentences to the jails' grievance processes, [Doc. 89 at 7], and they

never come up at all in the order's analysis of the merits. At one point, the order mentions in passing that Mr. Lewis requested cleaning supplies for his cell, *id.*, but that fact also does not appear in the order's analysis. The same is true of the jail's "kiosks," which are necessary for phone access but which use a purely visual interface. *Id.* The order also does not contain a single reference at all to the inmate handbooks, which are not provided as audiobooks or in any other non-visual format, and it similarly lacks any discussion of the evidence that jail staff had complete discretion to ignore any verbal requests for accommodations, and that staff had no training on their obligations to inmates with disabilities.

As set forth above, these facts are the true "core contentions" of Mr. Lewis' claims, and as set forth above, these facts also make up the bulk of the relevant evidence in the record. As such, the district court's order granting the Sheriffs summary judgment on the merits of Mr. Lewis' claims, without ever discussing this evidence, is a misapplication of the summary judgment standard and should therefore be reversed.

## II.    The district court erred in treating Mr. Lewis' claims under the Rehabilitation Act as dispositive of his claims under the ADA.

Although claims under the Rehab Act and Title II of the ADA are analyzed on their substance according to the same standards, *Cash*, 231 F.3d at 130, these two laws are subtly but significantly different when it comes to articulating a claim for damages. Specifically, although a showing of "deliberate indifference" is necessary

for Mr. Lewis to attain damages under the Rehab Act, the same is not true of his ADA claims, because the jails' violations of his rights under Title II of the ADA also amount to independent constitutional violations.

"Deliberate indifference," as a kind of discriminatory intent, is necessary in a claim for damages under the Rehab Act. *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012). Laws Congress passes under the Spending Clause, such as the Rehab Act, create a limited private right of action which depends on what exact obligations the recipient of federal funds knowingly undertakes by its receipt of such funds. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218-20 (2022) (summarizing the history of the Supreme Court's contract-theory Spending Clause jurisprudence). A claim for damages under the Rehab Act requires a showing of intent because recipients of federal funds only knowingly consent to damages for claims involving intentional discrimination (or a functional equivalent such as deliberate indifference). *Liese*, 701 F.3d at 346 (discussing *Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582 (1983), in the context of the Rehab Act). Intent is therefore effectively a fourth element of the *prima facie* case for damages under the Rehab Act. Specifically, it is a *procedural* necessity in any Rehab Act damages claim because the cause of action implicit in the Rehab Act, as Spending Clause legislation, only allows for damages as a *kind of remedy* in cases of intentional discrimination.

With the ADA, however, the essential issue is jurisdictional, not procedural. The availability of damages in an ADA claim against a state entity is a matter of sovereign immunity, in the vein of *City of Boerne v. Flores*, 521 U.S. 507 (1997), and the essential question whether the underlying facts involve a violation of the plaintiff's Fourteenth Amendment rights, because that is what abrogates the state's immunity to damages claims. *United States v. Georgia*, 546 U.S. 151, 159 (2006) ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.").

Thus, damages under the Title II of the ADA are available in a somewhat broader range of circumstances than under the Rehab Act. The two are identical in cases of intentional discrimination because this procedural necessity for the Rehab Act claim also amounts to an equal-protection violation. *See, e.g.*, *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 (11th Cir. 2008) ("[T]he equal protection clause prohibits only intentional discrimination." (citing *Washington v. Davis*, 426 U.S. 229, 248 (1976))); *Black v. Wigington*, 811 F.3d 1259, 1270 (11th Cir. 2016) (affirming denial of summary judgment on sovereign immunity grounds where the plaintiff's allegations included violations of the Equal Protection Clause); *Silberman v. Miami Dade Transit*, 927 F.3d 1123 (11th Cir. 2019) (analyzing Title II and Rehab Act claims identically where no constitutional issues were present). But intentional

discrimination is not the only kind of Fourteenth Amendment violation that opens the door to a Title II damages claim. Denial of access to the courts, for example, and deliberate indifference to a pretrial detainee's serious medical needs also work.[5] *Tennessee v. Lane*, 541 U.S. 509, 523 (2004) ("These rights include some, like the right of access to the courts at issue in this case, that are protected by the Due Process Clause of the Fourteenth Amendment."); *Georgia*, 546 U.S. at 159 (allowing damages claim to proceed because "this same conduct that violated the Eighth Amendment also violated Title II of the ADA").

At summary judgment, Mr. Lewis argued his injuries at the Fulton County jail include violations of his Fourteenth Amendment right against deliberate indifference to his serious medical needs. [Doc. 84 at 17-20]. The district court's order misapprehends this argument and dismisses it as only a freestanding and improper claim against Sheriff Labat, in his official capacity, for those constitutional violations outright. [Doc. 89 at footnote 2]. But the argument is not a claim for damages against Sheriff Labat under § 1983. The argument is rather that, like the plaintiff in *United States v. Georgia*, Mr. Lewis suffered simultaneous violations of

---

[5] "Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like [Mr. Lewis]. However, the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted).

his rights under the Constitution and Title II of the ADA, thereby stripping Sheriff Labat of immunity to Mr. Lewis' ADA claims. [Doc. 84 at 17-20].

Mr. Lewis also argued that his experiences at both jails include deprivations of his right of access to the courts. [Doc. 84 at 14-17; Doc. 85 at 15-18]. The district court declined to address these arguments "[b]ecause [Mr. Lewis'] Rehabilitation Act claims render immaterial whether the ADA abrogates Defendants' immunity to suit." [Doc. 89 at footnote 1].

But in dismissing Mr. Lewis' Rehab Act claim, the district court relied in part on its factual determination that "the record does not contain any evidence of the requisite knowledge and intent on the part of Sheriff Labat so as to constitute deliberate indifference." [Doc. 89 at 20] (citing *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999)). As such, the constitutional issues are not "immaterial" here. They are instead especially important, because they are what should allow Mr. Lewis' ADA damages claims to proceed even if the district court is correct that the Rehab Act claims fail for lack of deliberate indifference.

Thus, even if the Court affirms the district court's grant of summary judgment on the merits of Mr. Lewis' Rehab Act claims, the Court should still reverse the district court's order on the ADA claims, which the district court erroneously disposed of as essentially identical to the Rehab Act claims, without regard for Mr. Lewis' constitutional arguments.

**III.  The district court erred in determining Mr. Lewis' claims for prospective relief are moot.**

In addition to his claims for damages, Mr. Lewis seeks prospective relief, which is the usual remedy for Rehab Act and Title II claims "[i]n the ordinary course." *Silberman*, 927 F.3d at 1134. The district court, however, found that Mr. Lewis' concerns about being subjected to the above-described discrimination yet again are "speculative and unripe," and so the district court "agree[d] with Defendants that [Mr. Lewis'] claims for prospective relief are moot in light of his release from custody and dismissal of his criminal charges." [Doc. 89 at 21] (citations omitted). This is the third error that merits reversal of the district court's order. Mr. Lewis' claims are not moot.

Perhaps if Mr. Lewis just stumbled across some printouts of the jails' ADA policies and brought this lawsuit simply in the interest of civilian oversight—perhaps then Mr. Lewis' claims would be too speculative for him to have standing. But Mr. Lewis' standing for prospective relief is not the issue here—only whether his claims for such are moot by virtue of his release from custody. "The difference between the two [doctrines] is that the latter, but not the former, has a 'capable of repetition, yet evading review' exception . . . . As a result, 'there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.'"

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1189 (11th Cir. 2007) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190-91 (2000)). For example, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), "a patient's lawsuit challenging her confinement in a segregated institution was not mooted by her postcomplaint transfer to a community-based program, despite the fact that she would have lacked initial standing had she filed the complaint after the transfer." *Sheely*, 505 F.3d at 1189 (discussing *Olmstead*).

"[T]o satisfy the 'capable of repetition, yet evading review' exception to mootness, the Supreme Court has required that (1) there be a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration." *Sierra Club v. Martin*, 110 F.3d 1551, 1554 (11th Cir. 1997) (string cite omitted). Here, Mr. Lewis' case fits this exception nicely.

Regarding factor (1), to the limited extent Mr. Lewis can be expected to prove "a reasonable expectation or a demonstrated probability that [this] same controversy will recur involving the same complaining party," that is exactly what the evidence shows. For example, as discussed in detail above, the policies and processes at the Chatham and Fulton County jails are so dysfunctional—to the extent they exist at all—that the only thing that needs to happen for this same controversy to recur, with

the very same parties, is for Mr. Lewis to be arrested again and held at the Fulton or Chatham County jail. Further, Mr. Lewis lives in Atlanta, went to college in Atlanta, grew up in Savannah, and still considers Savannah his home, [Doc. 85-2 at ¶ 42], so if he is arrested again, it will likely involve pre-trial detention in at least one of the Chatham and Fulton County jails. Mr. Lewis naturally is in no hurry to prove "a reasonable expectation or a demonstrated probability" he will soon be arrested again, but it does bear mention that this very case arises out of an arrest that never should have occurred, [Doc. 84-9], which goes to show that one can never really predict when one will be taken to jail. In other words, to the extent the record *can* prove "a reasonable expectation or a demonstrated probability that [this] same controversy will recur involving the same complaining party," it does. Short of an affidavit from Mr. Lewis declaring his intent to get arrested, there's not much more evidence he theoretically could present under the circumstances.

Turning to factor (2), importantly, Mr. Lewis is not pursuing prospective relief from a state or federal prison. The policies at issue here pertain only to pretrial detainees, who are often in jail for a matter of hours, days, or, like Mr. Lewis, weeks. Realistically, the next time Mr. Lewis is arrested, for him to remain in jail long enough to see this litigation through to the end, he would need at a minimum to forgo bail and a speedy trial—and even then, his claims would take longer than usual for ADA litigation because he would first need to (somehow) exhaust his grievance

rights. Because of the usually brief time people spend in pre-trial detention—at least compared to the length of a civil-rights lawsuit—claims like Mr. Lewis' are, in most cases, clearly "too short to be fully litigated" before the plaintiff is no longer subject to the challenged policies. Indeed, this timing problem is likely at least partly responsible for the Fulton County jail's failure to update its ADA policy in over twenty years, despite many significant developments in disability-rights law and policy over that time span.

In short, Mr. Lewis' claims for prospective relief fall within the "capable of repetition, yet evading review" exception to the mootness doctrine, and the district court's denial of his prospective claims on mootness grounds is legally erroneous. Even if the Court affirms the district court's dismissal of Mr. Lewis' claims for damages, the district court's order should still be reversed regarding Mr. Lewis' claims for prospective relief.

## **CONCLUSION**

For the foregoing reasons, Mr. Lewis respectfully requests that the Court reverse the district court's order below granting the Sheriffs summary judgment on the merits of Mr. Lewis' claims for damages under the Rehabilitation Act. Further, or in the alternative, Mr. Lewis requests that the Court reverse the district court's order granting the Sheriffs summary judgment on Mr. Lewis' claims for damages

under the ADA. Mr. Lewis also requests that the Court reverse the district court's order dismissing Mr. Lewis' claims for prospective relief at moot.

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this pleading is prepared in 14-point Times New Roman font and complies with this Court's 13,000 word-count limitation, having 7,976 words.

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on October 25, 2023, he filed the foregoing Brief of Appellant through the Court's electronic filing system.

The undersigned counsel further certifies that on October 25, 2023, four (4) paper copies of the foregoing Brief of Appellant were mailed to the Clerk of Court by U.S. Priority Mail, postage prepaid.

/s/ Jake Knanishu
Jake Knanishu
Georgia Bar No. 597103